## UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF INDIANA, SOUTH BEND DIVISION

| | |
|---|---|
| AMBER MARIE LETTS CORDOVA, | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| vs. | ) CAUSE NO: |
| | ) |
| UNIVERSITY OF NOTRE DAME | ) |
| DU LAC, | ) 3:12CV 153 |
| | ) |
| DEFENDANT. | ) |

March 29, 2012

## COMPLAINT

**COMPLAINT AND DEMAND FOR JURY TRIAL**

### I. Nature of the Case

1. The plaintiff, Amber Marie Letts Cordova, who has a learning disability and a mental or psychological disability, brings this action against her former educational provider, University of Notre Dame du Lac ("Defendant"), alleging that it violated Title III of the Americans with Disabilities Act ("ADA"), as amended, 42 U.S.C. §§ 12181-12189 and Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794, by failing to provide the Plaintiff with appropriate accommodations in order to fully participate as a master-level student in Defendant's Masters Degree in Fine Arts

program ("Program"); expelling her from the Program, and retaliating against her for complaining about the lack of appropriate accommodations.

## II. Parties

2. Cordova was enrolled in Defendant's Program within the State of Indiana on the South Bend campus until her expulsion from the Program. She brings this lawsuit to remedy Defendant's discriminatory practices, and to compensate her for Defendant's refusal to provide her with reasonable accommodations that denied her an equal opportunity to participate in and benefit from the Program and engage in a successful career.

3. Defendant, University of Notre Dame du Lac is a private University, incorporated in the state of Indiana, operating globally with over forty campuses, with principal place of business at the University of Notre Dame Campus in the unincorporated municipality of Notre Dame, Indiana. Defendant owns, operates, and/or leases a place of public accommodation pursuant to 42 U.S.C. § 12181(7)(J). Defendant is a federal financial recipient. Defendant's agents at all material times herein as alleged in the Complaint, were acting within the scope of their employment and authority for Defendant.

## III. Jurisdiction And Venue

4. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 1343(a).

5. Venue is proper pursuant to 28 U.S.C. § 1391(c) as Defendant conducts business in this District.

6. All facts, events, and transactions giving rise to this lawsuit occurred within the geographic environs of the Northern District of Indiana; thus, venue is proper in this Court.

## IV. Factual Allegations

7. Cordova has a learning disability and a psychological disability. Her cognitive learning disability alters the manner in which she processes written materials and her ability to write. Her psychological disability results in periods of severe depression and anxiety. Her disabilities require accommodations in order for her to fully participate in an academic course of study.

8. Due to her disabilities, Cordova is substantially limited in the major life activities of learning, thinking, concentrating, reading, and sleeping. These limitations require reasonable accommodations in order for to access educational materials and content.

9. Cordova is a talented and highly regarded graphic designer. Her talents not only supported a successful career, but convinced Associate Professor of Graphic Design Robert Sedlack Jr. to recruit her to Defendant's Graphic Design Masters program. Cordova earned her Bachelor of Fine Arts from the Milwaukee Institute of Art and Design, an accredited institution with the third highest rated Art and Design under graduate program. Cordova was admitted on a talent-based scholarship and graduated on the Dean's List .

10. Cordova applied to the Program, was admitted, and enrolled as a graduate student in the Fall of 2008.

11. Cordova was selected to serve as the graduate assistant to Professor Sedlack.

12. She was awarded full tuition remittance, a full stipend, and a position as a Graduate Assistant

13. But for Defendant's failure to accommodate Cordova's disabilities and blatant discrimination, Cordova would have Graduated with a Masters of Fine Arts in the Spring of 2011.

14. Prior to the commencement of her course work but after her admission to the Program, Cordova requested information from Professor Sedlack concerning course requirements so that Cordova could propose any appropriate accommodations for her disabilities.  Specifically, Cordova requested the procedure to request appropriate accommodations.

15. Professor Sedlack did not respond to Cordova's requests.

16. On August 28, 2008, Cordova provided to Defendant medical records relating to her medical condition and disabilities.

17. Upon arrival to campus in the Fall of 2008, Cordova learned that Professor Sedlack refused to be her mentor and faculty instructor.  No explanation was provided for the sudden change, but the decision occurred after Cordova informed Professor Sedlack of her disabilities and need for accommodation.

18. Cordova again queried Defendant's officials about receiving appropriate accommodations for her course work, but Defendant's officials failed to provide

Cordova with any information concerning the implementation of appropriate accommodations or the accommodations.

19. Accommodations requested by Cordova included, but were not limited to: 1. Provision of PowerPoint presentations prior to class time; 2. Oral examinations instead of written examinations when possible; 3. Extension of time to complete certain written assignments; 4. Provide feedback and status reports on research assignments orally; and 5. Assistance with note taking.

20. Defendant promises to comply with all requirements of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act, both in its student and employee handbooks and in its assurances to the federal government of the United States of America when it receives federal funding to support its programs.

21. Cordova initially received exceptionally positive performance feedback from faculty on her work.

22. The positive feedback turned to criticism and harassment following Cordova's requests for accommodations and disclosure of her disabilities.

23. Beginning in January of 2009, Cordova disclosed her specific disabilities to professors and again requested appropriate accommodations.

24. On January 23, 2009, Cordova requested assistance from Disability Services Coordinator, Scott Howland and requested clarification on Defendant's process for obtaining necessary accommodations. Cordova also informed him that she was being discriminated against and retaliated against by Professor Sedlack.

25. Her request for assistance was ignored.

26. On March 16, 2009, Cordova discussed with Professor Sedlack not only her disabilities, but of the multiple requests for appropriate accommodations from Defendant's officials, all of which were ignored. Cordova captured this conversation in an e-mail to Mr. Howland.

27. On March 26, 2009, Cordova discussed with Charlie Barber, Professor and Department Chair, her disabilities and again requested appropriate accommodations.

28. On March 30, 2009, Professor Sedlack met with Martina Lopez, Professor and Director of Graduate Studies, disclosed Cordova's disabilities to her, and requested her assistance in removing Cordova from the Program.

29. On April 2, 2009, Cordova learned of a meeting scheduled by Professors Sedlack and Lopez for that same afternoon. The meeting was to discuss Cordova's status in the Program. Similarly situated students in the Program were not evaluated mid-semester and graduate students in the department do not receive grades or evaluations at all until the end of the semester.

30. That same day, Cordova informed Mr. Howland of this meeting and expressed concerned that the meeting was to discuss her status in the Program.

31. Mr. Howland intervened, delaying any meeting and informing Professors Sedlack and Lopez of their duty to discuss appropriate accommodations with Cordova. As a result of Mr. Howland's intervention, Professor Sedlack phoned Cordova and berated her for reporting him to Mr. Howland.

32. On April 2, 2009, Mr. Howland wrote in an e-mail to Cordova: "Thank you for your phone call. Based on our conversation I am recommending that you ask that this meeting be rescheduled. From what you have told me, it seems that they are

proposing to talk with you about your status in the program and only with a few hours

notice. In light of your recent disclosure of ADHD to your professor I feel it would

be more appropriate to plan a meeting to discuss what reasonable accommodations

could be provided. Especially since your disclosure came before this meeting was

proposed and not after. I am copying Charles Barber on this email to make him

aware of my recommendation."

33. On April 3, 2009, Director Lopez informed chair Barber that she was proceeding with

efforts to convince the disability services coordinator Howland that Cordova was not

a good "fit" in the department, to discourage him from providing disability services to

Cordova, and to convince Cordova to leave. Barber thanked Lopez for her efforts.

34. On April 6, 2009, Professor Sedlack, Professor Lopez, and Professor Ingrid Hess, met

with Cordova. This meeting was scheduled as a student advising session; however,

when Cordova arrived at the meeting, she was orally harassed by all three professors.

35. Instead of providing feedback, the three Professors informed her that she needed to

withdraw from the Program. This was in sharp contrast to the recommendation

provided by 504 Officer Howland.

36. The reasons provided to Cordova by the three faculty members included: "This just

isn't the right fit. You belong somewhere else."; "You are too different."; "You work

differently."; and "You don't belong here.".

37. During this meeting, Professor Lopez stated to Cordova: "Whatever your problems

are we don't have to deal with them. They don't allow you to be here."

38. Professors Hess and Lopez also informed Cordova that Department Chair Barber agreed with this assessment and supported the decision to request Cordova to withdraw from the Program.

39. Following this meeting, Cordova sent Professor Sedlack a letter outlining the accommodations she previously requested and asking how she might otherwise improve.

40. On April 8, 2009, Professor Sedlack again met with Cordova under false pretences stating "That letter you sent me, it was like you didn't hear a thing I said Monday! You are leaving!" He was red-faced and very angry during this meeting.

41. During this same meeting Cordova asked Professor Sedlack how he could request her to withdraw from the Program as her performance in other courses was sufficient to allow her to remain in the Program. Professor Sedlack responded by stating "Well, then I'll fail you!"

42. At the end of this meeting, Professor Sedlack informed Cordova that she had until 5:00 P.M. that same day to either withdraw or he would issue her a failing grade. He also informed Cordova that he would refuse to advise her from that day forth. There were five weeks remaining in the semester.

43. Withdrawing from the Program would result in failing grades for Cordova in every course for which she registered.

44. Later that same day, Cordova informed Chair Barber of this discriminatory demand. Chair Barber was shocked, stating this was inappropriate, as "Grades come at the end of the semester."

45. In an e-mail that same day, Cordova refused to withdraw from the Program. Professor held true to his promise and issued Cordova a failing grade, on April 20, 2009.

46. On April 9, 2009, Cordova officially complained to Chair Barber of the harassing and discriminatory conduct.

47. Following this abhorrent, discriminatory, and harassing conduct, Cordova complained to and attempted to discuss possible resolutions to her predicament with Chair Barber on the following dates:  4/2/09, 4/8/09, 4/9/09, 4/11/09, 4/14/09, 4/15/09, 4/20/09, 4/27/09, 5/1/09, 5/3/09, 5/8/09, 5/11/09, 5/12,09, 5/19/09, 6/1/09, 7/7/09, 9/25/09, and 9/18/09.

48. On May 1, 2009, without any support or response from her own department, Cordova complained next to Kathleen Brannock, Office of Institutional Equity, and the Discrimination Ombudsperson, Dwight King JD.  They instructed Cordova to file a grievance.

49. On May 17, 2009, Cordova met with Chair Barber, who reviewed the grievance that Cordova would file the following day.  Chair Barber suggested that Cordova file the grievance with the Office of Institutional Equity and title the grievance "A Grievance in Anticipation of Dismissal from Graduate Standing", as there was not an established procedure to grieve discrimination based on disability or failure to accommodate a disability.

50. On May 18, 2009, Cordova submitted a written grievance to Chair Barber and Kathleen Brannock, Office of Institutional Equity.

51. On June 1, 2009, Cordova received an e-mail from Professor Nyame Brown.  In this e-mail, Professor Brown stated that Professor Lopez forbid him from advising Cordova for the remainder of the semester.

52. On June 24, 2009, Cordova met with a make-shift Department Committee to discuss her grievance.  The committee members promised to keep all medical documentation confidential.

53. Two days later, Cordova's confidential medical documentation was inappropriately distributed to faculty.

54. Cordova submitted evidence to the ad-hoc Disability Hearing Board, but much of it was refused.  Additionally, her own instructors, including Barber, refused to provide testimony; however, Professor Doordan did testify that he was aware of Cordova's disabilities and would have provided appropriate accommodations if Defendant had not refused to provide the requested accommodations.

55. Defendant refuse to provide Cordova with records concerning her status as a student.

56. On July 15, 2009, Defendant held a hearing before the ad-hoc Disability Hearing Board.

57. At the hearing, the Board Chair noted that Professor Sedlack possessed Cordova's confidential medical documents.

58. Following an unsupportable decision issued by the Board, Cordova appealed the decision to Graduate School Associate Dean Barbara Turpin.

59. In the appeal, Dean Turpin refused to hear any evidence of discrimination based on Cordova's disabilities or any of her requested accommodations, even though this was contrary to Defendant's policy.

60. On August 10, 2009, Cordova was effectively expelled from the Program. Cordova was not aware of this fact at this time.

61. On August 15, 2009, the new academic year began. At this time, Cordova remained eligible for preferred tax status, financial aid, tuition remittance, and her stipend. Cordova registered for each benefit online. She also register for courses.

62. On August 24, 2009, Cordova began course work and resubmitted her appeal to Dean Turpin.

63. The following day, Dean Turpin instructed the registrar to remove Cordova from all registered fall semester courses and discontinued her student status.

64. That same day, August 25, 2009, Student Housing informed Cordova in an e-mail that she has twenty-four hours to vacate her residence. This is the form of communication used to informed Cordova that she was no longer a student.

65. On September 18, 2009, Dean Turpin chaired the appeal board hearing. Cordova attended and testified.

66. On September 24, 2009, the Board denied Cordova's appeal, suggesting she could have saved herself damages if she would just have withdrawn from the Program.

67. Cordova then appealed this decision to the Provost, who delayed the appeal on multiple occasions.

68. Finally, the Provost informed Cordova that a decision would be rendered the following February. Cordova objected to the distant future date with no reprieve.

69. As with her previous appeal, the Provost refused to hear evidence of discrimination based on Cordova's disabilities or the failure to provide appropriate accommodations.

70. The date provided by the Provost for a final decision passed without any action. After another two months, the Provost summarily denied Cordova's complaint on April 1, 2010, without explanation.

71. Defendant's actions were intentional, willful and in reckless disregard of Cordova's rights as protected by Federal law.

72. Cordova was and continues to be economically, physically, and emotionally harmed by Defendants' discriminatory and harassing actions.

### V. Count I:  Title III of the Americans with Disabilities Act

73. Cordova hereby incorporates paragraphs one (1) through seventy-two (72) of her Complaint herein.

74. Cordova is substantially limited in the major life activities of learning, thinking, concentrating, reading, and sleeping. Accordingly, she is considered an individual with a disability as defined under the ADA, 42 U.S.C. § 12102(2)(A).

75. Defendant owns, leases and/or operates a place of public accommodation as defined under Title III of the ADA, 42 U.S.C. § 12181(7)(J).

76. Defendant discriminated against Cordova on the basis of her disability, in violation of Title III of the ADA, 42 U.S.C. § 12182, by denying Cordova equal participation in the educational services offered to other students by refusing to provide reasonable accommodations including, but not limited to:  1. Provision of PowerPoint presentations prior to class time; 2. Oral examinations instead of written examinations

when possible; 3. Extension of time to complete certain written assignments; 4. Provide feedback and status reports on research assignments orally; and 5. Assistance with note taking.

77. Defendants' actions were intentional, willful, and/or undertaken in reckless disregard of Cordova's rights as protected by the ADA.

78. Cordova has suffered damages as a result of Defendants' unlawful actions.

## VI. COUNT II:  ADA, RETALIATION

79. Cordova hereby incorporates paragraphs one (1) through seventy-eight (78) of her complaint herein.

80. Cordova's requests for accommodations, reporting discrimination, and complaints to various faculty, 504 officer, Deans, and Provost concerning the lack of appropriate accommodations constituted protected activity.

81. Similarly-situated students who did not engage in protected activity were treated more favorably in that they were not expelled and excluded from the Program, did not suffer harassment and discrimination, and were permitted to fully engage in the Program.

82. Defendants unlawfully retaliated against Cordova because she engaged in protected activity by expelling her from the Program, depriving her of appropriate recourse to her complaints, and failing to curtail the harassment by Defendant's faculty.

83. Defendants acted with intent, malice, and or reckless disregard as to Cordova's legal rights under the ADA.

84. Cordova was harmed as a result of Defendants' conduct.

## VII. COUNT III: Violations of ADA Confidentiality Protections

85. Cordova hereby incorporates paragraphs one (1) through eighty-four (84) of her complaint herein.

86. Cordova provided confidential medical and disability-related documents to the appropriate officials of Defendant.

87. Defendant's officials disseminated the confidential medical and disability-related documents to certain employees of Defendant who had no need to access the documents and without Cordova's approval.

88. Defendants acted with intent, malice, and or reckless disregard as to Cordova's legal rights under the ADA and federal law.

89. Cordova was harmed as a result of Defendants' conduct.

## VIII. Count IV:  Section 504 of the Rehabilitation Act

90. Cordova hereby incorporates paragraphs one (1) through eighty-nine (89) of her Complaint herein.

91. Cordova is substantially limited in the major life activities of learning, thinking, concentrating, reading, and sleeping. Accordingly, she is considered an individual with a disability as defined under Section 504 of the Rehabilitation Act, as amended, 29 U.S.C. § 705(20)(B).

92. Cordova is a "qualified individual with a disability" under Section 504 of the Rehabilitation Act as she met the essential eligibility requirements for the receipt of Defendant's programs and services.

93. During all relevant times, Defendant was a recipient of federal financial assistance within the meaning of 29 U.S.C. § 794(b)(A)(1) by virtue of its participation in federal programs including, but not limited to, the federal student loan program.

94. Defendant discriminated against Cordova on the basis of her disability, in violation of Section 504 of the Rehabilitation Act, 29 U.S. C. § 794(a), by denying Cordova equal participation in the educational services offered to other students by refusing to provide reasonable accommodations including, but not limited to:  1. Provision of PowerPoint presentations prior to class time; 2. Oral examinations instead of written examinations when possible; 3. Extension of time to complete certain written assignments; 4. Provide feedback and status reports on research assignments orally; and 5. Assistance with note taking.

95. Defendants' actions were intentional, willful, and/or undertaken in reckless disregard of Cordova's rights as protected by Section 504 of the Rehabilitation Act.

96. Cordova has suffered damages as a result of Defendants' unlawful actions.

## IX. COUNT V: REHABILITATION ACT, RETALIATION

97. Cordova hereby incorporates paragraphs one (1) through ninety-six (96) of her complaint herein.

98. Cordova's requests for accommodations, reporting discrimination, and complaints to various faculty, 504 officer, Deans, and Provost concerning the lack of appropriate accommodations constituted protected activity.

99. Similarly-situated students who did not engage in protected activity were treated more favorably in that they were not expelled and excluded from the Program, did not

suffer harassment and discrimination, and were permitted to fully engage in the Program.

100.   Defendants unlawfully retaliated against Cordova because she engaged in protected activity by expelling her from the Program, depriving her of appropriate recourse to her complaints, and failing to curtail the harassment by Defendant's faculty.

101.   Defendants acted with intent, malice, and or reckless disregard as to Cordova's legal rights under Section 504 of the Rehabilitation Act.

102.   Cordova was harmed as a result of Defendants' conduct.

## X. COUNT VI: REHABILITATION ACT, Confidentiality Protections

103.   Cordova hereby incorporates paragraphs one (1) through one-hundred two (102) of her complaint herein.

104.   Cordova provided confidential medical and disability-related documents to the appropriate officials of Defendant.

105.   Defendant's officials disseminated the confidential medical and disability-related documents to certain employees of Defendant who had no need to access the documents and without Cordova's approval.

106.   Defendants acted with intent, malice, and or reckless disregard as to Cordova's legal rights under Section 504 of the Rehabilitation Act.

107.   Cordova was harmed as a result of Defendants' conduct.

## XII. COUNT VII: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

108.    Cordova hereby incorporates paragraphs one (1) through one-hundred and seven
        (107) of her complaint herein.

109.    Defendant acted intentionally or recklessly in the treatment and harassment of
        Cordova by ignoring her requests for assistance, belittling her need for
        accommodations, and orchestrating her expulsion from the Program.

110.    Defendant's conduct was extreme and outrageous.

111.    Defendant's acts were and are the cause of Cordova's distress.

112.    Cordova suffers severe emotional distress as a result of defendant's conduct,
        requiring medical attention and ongoing treatment.

### Relief Requested

WHEREFORE, Plaintiff, Amber Marie Letts Cordova, requests that this Court find in her

favor and provide her with the following relief:

A.   Enjoin Defendants from engaging in further violations of Federal and State anti-discrimination laws, including but not limited to the ADA and Rehabilitation Act;

B.   Order Defendant to reinstate Cordova in the Program with all commensurate compensation, benefits and priority or payment of all lost benefits in lieu thereof;

C.   Order Defendant to pay to Cordova wages, benefits, compensation, damages and all monetary loss suffered as a result of Defendants' wrongful and unlawful actions in an amount that will make her whole, account for the harm caused to her professional standing and reputation, and depriving her of future professional opportunities;

D.   Order Defendants to pay to Cordova liquidated damages;

E.   Order Defendant to pay to Cordova actual, compensatory, and punitive damages;

F.   Order Defendant to pay Cordova's costs and attorney fees incurred in litigating this action;

G.   Order Defendant to pay to Cordova pre- and post-judgment interest on all sums recoverable; and

H.   Order Defendant to provide to Cordova any and all other legal and/or equitable relief that may be just and proper.


Respectfully submitted,

/s Michael S. Dalrymple

Michael S. Dalrymple, (23539-53)

Michael S. Dalrymple, Attorney at Law

1847 Broad Ripple Avenue

Suite 1A

Indianapolis, Indiana 46220

(317) 614-7390

michaeld@dalrymple-law.com

Attorney for Plaintiff, Amber Marie Letts Cordova

## DEMAND FOR JURY TRIAL

The Plaintiff, Amber Marie Letts Cordova, by counsel, respectfully requests a jury trial as
to all issues deemed so triable.

Respectfully submitted,

_____

/s Michael S. Dalrymple

Michael S. Dalrymple, (23539-53)

Michael S. Dalrymple, Attorney at Law

1847 Broad Ripple Avenue

Suite 1A

Indianapolis, Indiana 46220

(317) 614-7390

michaeld@dalrymple-law.com

Attorney for Plaintiff, Amber Marie Letts Cordova

## CERTIFICATE OF SERVICE

I certify that on the 29th day of March, 2012, I served the foregoing via electronic means to the known attorney of named Defendant.

/s Michael Dalrymple
Michael Dalrymple, #23539-53