**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| AMBER MARIE LETTS CORDOVA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     3:12-CV-153 |
| | ) |
| UNIVERSITY OF NOTRE DAME | ) |
| DU LAC, | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

This matter is before the Court on the Defendant's Motion to Dismiss Plaintiff's Complaint, filed by Defendant, University of Notre Dame Du Lac, on June 1, 2012. (DE #6.) For the reasons set forth below, the motion is **GRANTED.** The plaintiff's claims are **DISMISSED with prejudice**, and the clerk is **ORDERED** to close this case.

## BACKGROUND

Plaintiff, Amber Marie Letts Cordova ("Cordova"), originally filed a complaint on July 13, 2011, in the United States District Court for the Northern District of Indiana, cause number 3:11-CV-210, against Defendant, the University of

Notre Dame Du Lac ("Notre Dame"). On December 13, 2011, the Honorable Robert L. Miller, issued an opinion and order for that case which, as related to Notre Dame, provided that several of Cordova's claims were dismissed with prejudice and several were dismissed without prejudice. Cordova filed a new complaint with this Court for those claims dismissed without prejudice against Notre Dame on March 30, 2012.

In this most recent complaint, Cordova states that she has a cognitive learning disability which "alters the manner in which she processes written materials and her ability to write" and a mental or psychological disability which results in "periods of severe depression and anxiety." (DE #1, p. 1, 3.) She further states that these disabilities cause her to be "substantially limited in the major life activities of learning, thinking, concentrating, reading, and sleeping" and require "reasonable accommodations in order for to [sic] access educational materials and content." (*Id.* at 3.) Cordova alleges that Notre Dame:

> violated Title III of the Americans with Disabilities Act ("ADA"), as amended 42 U.S.C. §§ 12181-12189 and Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794, by failing to provide [her] with appropriate accommodations in order to fully participate as a master-level student in Defendant's Masters Degree in Fine Arts program ("Program"); expelling her from the Program, and retaliating against her for complaining about the lack of appropriate accommodations.

(*Id.* at 1-2.) She also alleges that she suffered "severe emotional distress" as a result of Notre Dame's conduct. (*Id.* at 17.) In her complaint, Cordova describes numerous occasions on which she allegedly requested but was denied accommodations by Notre Dame faculty members, and she sets out the steps she took to file related grievances and appeals. (*Id.* at 4-11.) Cordova states that she was "effectively expelled from the Program" on August 10, 2009, but that she was "not aware of this fact at this time." (*Id.* at 11.) Several days later she registered for courses, began her course work, and resubmitted her appeal; however, Graduate School Associate Dean Turpin "instructed the registrar to remove Cordova from all registered fall semester courses and discontinued her student status" on August 25, 2000. (*Id.*) That same day, she was informed via an email from Student Housing that she had twenty-four hours to vacate her residence, and Cordova states that this was the communication to inform her that she was "no longer a student." (*Id.*) Cordova subsequently testified at an appeal board hearing, and on September 24, 2009, her appeal was denied. (*Id.*) She "appealed this decision to the Provost," but her complaint was "summarily denied" on April 1, 2010. (*Id.* at 11-12.)

Notre Dame filed the instant motion in lieu of an answer. Cordova filed her response on June 25, 2012, to which Notre Dame

filed a reply on July 3, 2012. The motion is ripe for adjudication.

**<u>DISCUSSION</u>**

Federal Rule of Civil Procedure 12(b)(6) allows a complaint to be dismissed if it fails to "state a claim upon which relief can be granted." Allegations other than fraud and mistake are governed by the pleading standard outlined in Federal Rule of Civil Procedure 8(a), which requires a "short and plain statement" showing that the pleader is entitled to relief. In order to survive a Rule 12(b)(6) motion, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). All well-pleaded facts must be accepted as true, and all reasonable inferences from those facts must be resolved in the plaintiff's favor. *Pugh v. Tribune Co.*, 521 F.3d 686, 692 (7th Cir. 2008). However, a plaintiff may plead himself out of court if the complaint includes allegations that show he cannot possibly be entitled to the relief sought. *McCready v. eBay, Inc.*, 453 F.3d 882, 888 (7th Cir. 2006).

The Seventh Circuit has cautioned against granting Rule 12(b)(6) motions based on affirmative defenses because "[t]he

mere presence of a potential affirmative defense does not render the claim for relief invalid." *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012). However, while affirmative defenses "typically turn on facts not before the court at that stage in the proceedings," cases may be properly dismissed prior to discovery "when all relevant facts are presented." *Id*. See *Brooks v. Ross*, 578 F.3d 574, 579 (7th Cir. 2009) (statute of limitations argument was properly addressed at the motion to dismiss stage "because the relevant dates [were] set forth unambiguously in the complaint.")[1]

In its motion to dismiss, Notre Dame argues that the complaint affirmatively shows all of Cordova's claims are time-barred. Cordova disagrees.

*Cordova's Claims Under Title III of the ADA*

Cordova brings several claims pursuant to Title III of the ADA, as amended, 42 U.S.C. §§ 12181-12189, which provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation . . . ." 42 U.S.C. § 12182. The ADA is a "broad mandate" of "comprehensive

---

[1] In such a case, the practical effect of a Rule 12(b)(6) motion is the same as a motion for judgment on the pleadings under Rule 12(c). *Brooks*, 578 F.3d at 579.

character" and "sweeping purpose" intended "to eliminate discrimination against disabled individuals, and to integrate them into the economic and social mainstream of American life." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001) (citation and quotation marks omitted); see also 42 U.S.C. § 12101(b)(1), (2) (providing that the ADA is intended "to provide a clear and comprehensive national mandate" for eliminating disability discrimination as well as "clear, strong, consistent, enforceable standards" addressing such discrimination).  In terms of the ADA, "disability" with respect to an individual is defined as (A) "a physical or mental impairment that substantially limits one or more major life activities of such individual"; (B) "a record of such an impairment"; or (C) "being regarded as having such an impairment."  42 U.S.C. § 12102(1).

Because the ADA does not contain its own limitation period, courts have been directed to apply the statute of limitations of the state cause of action "most analogous" to the plaintiff's claims.  See *Wilson v. Garcia*, 471 U.S. 261, 266 (1985); *Scherr v. Marriott Intern., Inc.*, 703 F.3d 1069, 1075 (7th Cir. 2013). ADA claims brought in a federal court sitting in Indiana are generally governed by Indiana's two year statute of limitations for personal injury claims.  Ind. Code § 34-11-2-4; *Soignier v. Am. Bd. of Plastic Surgery*, 92 F.3d 547, 551 n. 3 (7th Cir. 1996).

However, in 2004 the Supreme Court held that if a plaintiff's claim is "made possible by a post-1990 enactment," the action is governed by the four year statute of limitations period set forth in 28 U.S.C. section 1658. *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 380 (2004). The Court noted that section 1658 also applies to those claims that are created by amending existing statutes, and "[a]ltering statutory definitions, or adding new definitions of terms previously undefined, is a common way of amending statutes." *Id.* at 381 (quoting *Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 308 (1994)); see also *Middleton v. City of Chicago*, 578 F.3d 655, 659 (7th Cir. 2009). The *Jones* Court stated that "[w]hat matters is the substantive effect of an enactment--the creation of new rights of action and corresponding liabilities--not the format in which it appears in the Code." *Jones,* 541 U.S. at 381. In a footnote, the Court acknowledged the potential difficulty in determining the viability of certain actions when authority is split regarding the scope of the original statute but noted that courts "will have to determine whether the amendment clarified existing law or created new rights and liabilities." *Id.* at 385, n. 18.

Effective January 1, 2009, the ADA was amended to "carry out the ADA's objectives" by "reinstating a broad scope of protection." See ADA Amendments Act of 2008 ("ADAAA"), Pub. L.

No. 110-325, 122 Stat. 3553 (2008).  The ADAAA itself is described as "[a]n Act to *restore the intent and protections* of the Americans with Disabilities Act of 1990," and in its findings Congress specifically noted that the original intent of the ADA was to provide "broad coverage" and a "clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."  *Id*. (emphasis added).  Specifically, Congress found that the United States Supreme Court had improperly narrowed the protection intended to be afforded under the ADA, and the ADAAA rejected the holdings of *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999) and *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184 (2002).  Importantly, the ADAAA left the ADA's three-category definition of "disability" intact[2] but clarified how the categories are to be interpreted.

For example, the ADAAA now provides a specific definition for the term "Major Life Activities"[3] whereas prior to the

---

[2]  As stated above, "disability" with respect to an individual is defined as (A) "a physical or mental impairment that substantially limits one or more major life activities of such individual"; (B) "a record of such an impairment"; or (C) "being regarded as having such an impairment."  42 U.S.C. § 12102(1).

[3]  The definition provides: "major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working" and also include "the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions."  42 U.S.C. § 12102(2)(A), (B).

amendments, courts frequently looked to the regulations interpreting the Rehabilitation Act of 1973 and the EEOC regulations for guidance. See *Toyota*, 534 at 193-94 (relying on Rehabilitation Act regulations issued by the Department of Health, Education, and Welfare ("HEW") (45 CFR § 84.3(j)(2)(ii)); *Duda v. Bd. of Educ. of Franklin Park Pub. Sch. Dist. No. 84*, 133 F.3d 1054, 1058, n. 6 (7th Cir. 1998) (relying on EEOC regulations (29 C.F.R. § 1630.2(i)). Congress also added specific "[r]ules of construction regarding the definition of disability" which provide:

> (A) The definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter.
> (B) The term "substantially limits" shall be interpreted consistently with the findings and purposes of the ADA Amendments Act of 2008.
> (C) An impairment that substantially limits one major life activity need not limit other major life activities in order to be considered a disability.
> (D) An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active.
> (E)(i) The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures . . . .

42 U.S.C. § 12102(4). In essence, the ADAAA reestablished the original intent and expansive scope of the ADA.

Cordova, however, argues that several of these changes "directly impact" her claims, which would, in turn, trigger the applicability of section 1658's four year limitations period.

She states that the ADAAA "altered the definition of major life activity" and revised how courts need to measure whether an impairment "substantially limits" those activities, and she points out that *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184 (2002) has been overturned. While it is true that *Toyota* is no longer good law, Cordova does not explain why it is the enactment of the ADAAA that made her claims possible.

*Toyota* involved an individual claiming to be disabled due to her carpal tunnel syndrome and other related impairments. *Toyota*, 534 at 187. The individual based her claim on the fact that she was substantially limited in performing manual tasks, doing housework, gardening, playing with her children, lifting, and working. *Id*. at 190. The Court held that "[m]erely having an impairment does not make one disabled for purposes of the ADA. Claimants also need to demonstrate that the impairment limits a major life activity" and that the limitation is "substantial." *Id*. at 195. In focusing on the claimant's argument that her disabilities affected her ability to perform manual tasks,[4] the Court concluded that "[t]he word 'substantial' . . . clearly precludes impairments that interfere in only a minor way with the performance of manual tasks from qualifying disabilities" and that major life activities refer only to

---

[4]  The Court specifically noted that it "express[ed] no opinion on the working, lifting, or other arguments for disability status." *Toyota*, 534 at 193.

"those activities that are of central importance to daily life."
*Id.* at 197. However, in enacting the ADAAA, Congress pointed
out that the *Toyota* Court had improperly narrowed the ADA's
broad scope of protection by "interpret[ing] the term
'substantially limits' to require a greater degree of limitation
than was intended by Congress." See ADAAA, Pub. L. No. 110-325,
122 Stat. 3553 (2008).

Here, Cordova alleges she has a cognitive learning
disability that "alters the manner in which she processes
written materials and her ability to write" and a psychological
disability that results in "periods of severe depression and
anxiety." Because of these disabilities, Cordova states that
she is "substantially limited in the major life activities of
learning, thinking, concentrating, reading, and sleeping" and
that Notre Dame discriminated against her because of these
disabilities. Taking these facts as true, which the Court must
do at this stage, Cordova has alleged a violation of the ADA as
originally enacted as well as a violation of the recently
amended ADAAA. Nothing in the now obsolete *Toyota* framework
changes this analysis.

A learning disability that substantially limits a person's
ability to learn, think, and concentrate (activities of central
importance to daily life) is precisely the type of disability
the ADA has always sought to protect. See e.g. *DePaoli v.*

*Abbott Lab.*, 140 F.3d 668, 671 (7th Cir. 1998) (citing to EEOC regulations at 29 C.F.R. § 1630.2 to define mental impairment as one which includes "specific learning disabilities" and major life activities as those which include functions such as "learning"); *Duda*, 133 F.3d at 1058-59 (citing to the same regulations and finding that plaintiff had sufficiently alleged mental disability); see also 45 CFR § 84.3 (HEW regulations defining mental impairment as "any mental or psychological disorder, such as . . . emotional or mental illness, and specific learning disabilities"). Similarly, a psychological disability that substantially limits learning, thinking, concentrating, reading, and sleeping is also a disability that has been deserving of protection under both the ADA and the ADAAA. Cordova argues that prior to the passage of the ADAAA, Seventh Circuit case law held that "isolated bouts" of depression did not constitute disabilities. See *Brunker v. Schwan's Home Serv., Inc.*, 583 F.3d 1004, 1008 (7th Cir. 2009); *Kinney v. Century Services Corp. II*, 2011 WL 3476569, *10 (S.D. Ind. Aug. 9, 2011). While technically accurate, the Seventh Circuit has also held that "[m]ajor depression can constitute a disability under the ADA." *Ogborn v. United Food and Commercial Workers Union, Local No. 881*, 305 F.3d 763, 767 (7th Cir. 2002) (collecting cases). Here, Cordova alleges a psychological disability that results in "periods of severe depression and

anxiety" and substantially limits her various life activities. She does not allege that her psychological disability was "isolated" or in remission. Taking her at her word and relying on the facts as stated in the complaint,[5] Cordova has alleged disability-based discrimination claims that would have been actionable under the original terms and provisions of the ADA; her claims were not created by the recent amendments which simply clarified the existing statute by restoring its original intent and broad scope. Thus, Cordova's claims are subject to Indiana's two-year statute of limitations period for personal injury actions.

To pinpoint the date a statute of limitations expires, a court must look to when that particular claim accrued. "Accrual is the date on which the statue of limitations begins to run." *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450 (7th Cir. 1990). In general, a "discovery rule" applies in federal-question cases making it the date "on which the plaintiff discovers he has been injured" that matters. *Id*. In *Del. State Coll. v. Ricks*, 449 U.S. 250, 259 (1980), the Supreme Court

---

[5] It is true that the existence of a disability has generally been determined on a "case by case" basis. See *DePaoli*, 140 F.3d at 672. However, for purposes of this motion, the Court must take all of the allegations as stated in the complaint as true; Cordova has alleged that she has a learning disability and psychological disability that substantially limits her in the major life activities of learning, thinking, concentrating, reading, and sleeping. The Court takes these claims at face value.

defined the discovery date as one on which a plaintiff is notified of a discriminatory decision. As applied to the facts in *Ricks*, this meant that the plaintiff's claim accrued when the decision was made to deny him tenure and not later when his employment was officially terminated. *Id.* at 258. The Court noted that "[t]he proper focus is upon the time of the discriminatory acts, not upon the time at which the consequences of the acts became most painful." *Id.* (citations omitted). The Court further explained that "the pendency of a grievance, or some other method of collateral review of an employment decision, does not toll the running of the limitations periods." *Id.* at 261.

The Seventh Circuit embraced this concept in a situation analogous to the instant case. In *Soignier v. Am. Bd. of Plastic Surgery*, 92 F.3d 547, 549-50 (7th Cir. 1996), a plastic surgeon sued an examination board under the provisions of the ADA for failing to accommodate his learning disabilities. The plaintiff did not pass the oral examination portion of the certification test after requesting but being denied accommodations. *Id.* Subsequently, the plaintiff pursued a "voluntary internal appeal" and requested that he be given another oral examination with additional accommodations. *Id.* at 550. The board "alerted him" that his requests were unlikely to be granted, and approximately eighteen months later, the board

officially denied his internal appeal. *Id*. In upholding the district court's decision that the plaintiff's claims accrued when the board administered the final oral examination without the requested accommodations, the Seventh Circuit noted that it is the "discovery of the original act of discrimination, *not* future confirmation of the injury or determination that the injury is unlawful" that triggers the statute of limitations. *Id*. at 551 (emphasis in original) (collecting cases). A "refusal to undo a discriminatory decision is not a fresh act of discrimination." *Id*. at 552.

Here, Notre Dame argues that Cordova's claims accrued, at the very latest, in August of 2009 and that the statute of limitations expired in August of 2011. Cordova, on the other hand, argues that her claims did not accrue until April 1, 2010, which would have given her until April 1, 2012, to file her lawsuit.

In her complaint, Cordova alleges she was "effectively expelled from the Program" on August 10, 2009, but that she was "not aware of this fact at this time." However, she goes on to state that, on August 25, 2009, the registrar was instructed by Dean Turpin to remove her from all courses and "discontinue[] her student status." On that same day, Cordova states that she received an email from Student Housing indicating she had twenty-four hours to vacate her residence and informing her that

15

"she was no longer a student."  Thus, by her own allegations, Cordova discovered Notre Dame's final discriminatory act (expelling her from the Program) on August 25, 2009.  It is this date on which her claims accrued.[6]

Finally, while Cordova essentially argues that the statute of limitations was tolled until April 1, 2010, when the Provost denied her appeal, this argument is squarely foreclosed by Seventh Circuit case law.  See *Soignier*, 92 F.3d at 553 (noting that "internal appeals are not part of the ADA statutory procedure and do not toll the time for filing suit" and finding that plaintiff "had to file suit within two years of the accrual date even if he had not exhausted all possible internal remedies").  Here, Cordova discovered the allegedly discriminatory decision to expel her from the Program[7] in late August of 2009, and she admits in her response brief that she was "under no obligation" to utilize Notre Dames's internal complaint process.  The fact that she appealed the decision to

---

[6] Cordova also alleges that she testified at an appeal hearing on September 18, 2009, and that the board denied her appeal on September 24, 2009, suggesting that she "could have saved herself damages if she would have just withdrawn from the Program."  Thus, even giving Cordova the benefit of the doubt that she did not have actual knowledge of the final discriminatory act until after the hearing, her claims accrued no later than September 24, 2009.

[7] Cordova specifically states in her complaint that Notre Dame discriminated against her by failing to accommodate her and "expelling her from *the Program*" (emphasis added).  Although she now attempts to assert that she is only bringing claims against Notre Dame for terminating her ultimate relationship with the university, this argument is without merit.  This is especially true considering the fact that Cordova admits her student status was "discontinued" and she was notified that she was "no longer a student" in August of 2009.

expel her from the Program to the Provost has no bearing on when her claims accrued.

In sum, based on the allegations stated on the face of the complaint, Cordova needed to file her ADA discrimination claims by August 25, 2011, in order for these claims to be timely. She did not file her complaint with this Court until March 30, 2012; thus, her claims are barred by the applicable two-year statute of limitations.

*Cordova's Claims Under Section 504 of the Rehabilitation Act*

Cordova relies on the same set of facts to bring her claims pursuant to section 504 of the Rehabilitation Act, which provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a). In the Seventh Circuit, courts use the precedent under the ADA to analyze Rehabilitation claims because the statutes are so similar. See *Garg v. Potter*, 521 F.3d 731, 736 (7th Cir. 2008); *Wash. v. Ind. High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840, 845 (7th Cir. 1999) ("the elements of claims under the two provisions are nearly identical, and precedent under one statute typically applies to the other.") See also

*Bragdon v. Abbott*, 524 U.S. 624, 631-32, (1998) (stating that courts are required to "construe the ADA to grant at least as much protection as provided by the regulations implementing the Rehabilitation Act").

As with claims under the ADA, a claim brought in federal court under this provision of the Rehabilitation Act is generally governed by the statute of limitations for personal injury claims of the state in which the federal court is sitting. *Conley v. Vill. of Bedford Park*, 215 F.3d 703, 710, n. 5 (7th Cir. 2000). Under Indiana law, such claim must be commenced within two years after the cause of action accrues. Ind. Code § 34-11-2-4. However, as noted above, if a plaintiff's claim is "made possible by a post-1990 enactment," the action is governed by the four year statute of limitations period set forth in 28 U.S.C. section 1658. *Jones*, 541 U.S. at 380.

Arguing that section 1658 should apply to all of her federal claims, Cordova states that "Congress has amended both acts implicated by Plaintiff's claims following the passage of section 1658." However, while she specifically refers to the ADAAA, Cordova does not cite to any particular amendment of the Rehabilitation Act on which she bases her argument. Instead, she simply points out that Congress amended the ADA to ensure that it "would be interpreted consistently with how courts had

applied the definition of a handicapped individual under the Rehabilitation Act of 1973." ADAAA, Pub. L. No. 110-325, 122 Stat. 3553 (2008). In fact, the Court notes that, in order to conform with the ADAAA, the definition of "individual with a disability" under the Rehabilitation Act was amended in several sections to include "any person who has a disability as defined in section 12102 of Title 42" of the ADA. See 29 U.S.C. 705(9)(B), (20)(B); ADAAA, Pub. L. No. 110-325, 122 Stat. 3553 (2008).

As such, and because the underlying facts alleging disability and discriminatory conduct are the same, the Court's analysis of Cordova's claims under the ADA applies equally to her claims under the Rehabilitation Act. Cordova's claims are subject to Indiana's two-year statute of limitations period for personal injury actions, and, as described in detail above, are time-barred.

*Cordova's Claim of Intentional Infliction of Emotional Distress Pursuant to State Law*

Finally, Cordova alleges that Notre Dame acted "intentionally or recklessly" to harass her by "ignoring her requests for assistance, belittling her need for accommodations, and orchestrating her expulsion from the Program." Notre Dame argues that this claim is untimely under the applicable Indiana

statute of limitations.  Cordova has failed to respond to this argument.

For a state law claim such as intentional infliction of emotional distress, a federal court must apply the applicable state law statute of limitations.  *Parish v. City of Elkhart*, 614 F.3d 677, 679 (7th Cir. 2010).  In Indiana, the timeliness of a claim for intentional infliction of emotional distress is governed by Indiana Code 34-11-2-4, which requires that an action be commenced within two years of the date on which the action accrued.  See *Hildebrand v. Hildebrand*, 736 F.Supp. 1512, 1517 (S.D. Ind. 1990).  The standard discovery rule in Indiana is that the claim "accured at the time the individual knew or should have known of the tort."  *Parish*, 614 F.3d at 683; see also *Filip v. Block*, 879 N.E.2d 1076, 1082 (Ind. 2008) (statute begins to run when "plaintiff knew or, in the exercise of ordinary diligence, could have discovered that an injury had been sustained as a result of the tortious act of another").

Here, Cordova knew of Notre Dame's allegedly "extreme and outrageous" conduct which caused her emotional distress by August 25, 2009, when it succeeded in "orchestrating her expulsion from the Program."  On this date, she alleges she was instructed to vacate her residence and was notified that she was "no longer a student."  Thus, her intentional infliction of

emotional distress claim accrued on August 25, 2009, and is barred by the applicable two-year statute of limitations.

**CONCLUSION**

For the reasons set for the above, the Defendant's Motion to Dismiss Plaintiff's Complaint, filed by Defendant, University of Notre Dame Du Lac, on June 1, 2012 (DE #6), is **GRANTED.** The plaintiff's claims are **DISMISSED with prejudice**, and the clerk is **ORDERED** to close this case.

**DATED:  March 29, 2013**          **/s/RUDY LOZANO, Judge**
                                    United States District Court